UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇

**DOUGLAS SUTTON and ANNE SERLING-SUTTON,**

                              **Plaintiffs,**

          **vs.**                                              **5:03-CV-0664**
                                                               **(NAM)(GJD)**

**TOMPKINS COUNTY, and TOMPKINS COUNTY
DEPARTMENT OF SOCIAL SERVICES, and MARY PAT
DOLAN, individually and as Commissioner of the Tompkins
County Department of Social Services, and REBECCA BUSH,
individually and as Deputy for the Commissioner of the Tompkins
County Department of Social Services, and PENNY VAN
SCHOICK, individually and in her official capacity as employee of
Tompkins County Department of Social Services, and CINDY
JACOBSON, individually and in her official capacity as employee
of Tompkins County Department of Social Services, and AMY
CHAFEE, individually and in her official capacity as employee of
Tompkins County Department of Social Services, and KATE
CHASON, individually and in her official capacity as employee of
Tompkins County Department of Social Services, and DEBRA
RIVERA, individually, personally and in her official capacity as a
foster parent certified by the Tompkins County Department of
Social Services, and BARB BLOM, individually, personally and in
her official capacity as a foster parent certified by the Tompkins
County Department of Social Services,**

                              **Defendants.**

◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇

APPEARANCES:

Holmberg, Galbraith, Van Houten & Miller
Lee M. Van Houten, Esq., of Counsel
Scott A. Miller, Esq., of Counsel
200 East Buffalo Street, Suite 502
Ithaca, New York14851-6599
and
Thaler & Thaler
Thomas D. Cramer, Esq., of counsel
309 North Tioga Street
P.O. Box 266
Ithaca, New York 14851-0266

Attorneys for Plaintiffs

Office of Tompkins County Attorney
Jonathon Wood, Esq., of Counsel
125 East Court Street
Ithaca, New York 14850
Attorney for Defendants

**Hon. Norman A. Mordue, Chief District Judge:**

## MEMORANDUM-DECISION AND ORDER

### INTRODUCTION

In their amended complaint (Dkt. No. 2), plaintiffs claim their rights were violated when defendant Tompkins County Department of Social Services ("DSS") obtained custody of their daughter E.S., then aged 16, and placed her in foster care. The amended complaint states claims under 42 U.S.C. § 1983 ("section 1983") and New York State law. All claims against defendants Debra Rivera and Barb Blom were dismissed by stipulated order (Dkt. No. 40). Presently before the Court is the motion by defendants for summary judgment (Dkt. No. 63). For the reasons set forth below, the Court grants the motion, dismisses the section 1983 claim on its merits, and dismisses the state law claims without prejudice.

### BACKGROUND

On February 27, 2002, plaintiffs' daughter E.S., then 16, told Heidi Lipson-Copeland, her therapist, that she had been sexually abused by her father, plaintiff Douglas Sutton, for many years, from as early as she could remember until sometime in middle school. Lipson-Copeland reported the allegation to the DSS. The case was assigned to defendant Cindy Jacobson, a DSS caseworker. Jacobson met with E.S., school and law enforcement officials, and E.S.'s mother, plaintiff Anne Serling-Sutton. E.S.'s mother agreed with Jacobson that E.S. would live with a

local aunt during the investigation of the allegations.  On March 25, 2002, the parents had E.S. taken involuntarily to Four Winds, a psychiatric hospital in Saratoga, New York.

Jacobson, under the supervision of her case supervisor, defendant Pendleton Van Schoick, investigated E.S.'s allegations.  The investigation included interviews with and observations of E.S, who consistently maintained that the allegations were true.  Jacobson stated that she observed that ES suffered from depression and engaged in self-destructive behaviors, symptoms which Jacobson viewed as consistent with abuse.  Jacobson's investigation also included the following: interviews with Lipson-Copeland; interviews with E.S.'s parents, her younger brother, her best friend, her godmother, the aunt with whom E.S. had stayed, and the social worker at E.S.'s school; a visit to the aunt's home while E.S. was staying there; interviews with counselors at Four Winds, including E.S.'s therapist Kelly Keohan; and reviews of documents provided by Lipson-Copeland and Four Winds.  Throughout this time, E.S. remained at Four Winds in her parents' custody and control.  Jacobson states that as a result of her investigation, she reached a good faith belief that the abuse had occurred.

On April 1, 2002, DSS filed a petition with Tompkins County Family Court seeking a determination that E.S. was the subject of abuse and an order granting custody to DSS.  On the same date, Family Court Judge M. John Sherman issued two Orders to Show Cause returnable April 12, 2002, one to each parent, ordering them to show cause why temporary custody of E.S should not be granted to DSS.  In the case of the father, the Order to Show Cause set forth the following findings: that "[t]he child appears to so suffer from neglect/abuse of [her father] that foster care ... is necessary to avoid imminent danger to the child's life or health"; that based on the petition and caseworker's affidavit her return to the home and care of her parents "would be

contrary to the best interest of the child in that [her father] has subjected [her] to sexual contact";
that based on the petition and caseworker's affidavit reasonable efforts to prevent or eliminate the
need for the removal of the child from the home were made ... [in that DSS] attempted to develop
a safety plan for the child and the [father] refused to cooperate"; and that "[i]mminent risk to the
child would not be eliminated by the issuance of an order of protection[.]"  The order recited that
the findings were based on the DSS petition.  With respect to the mother, the court found that the
child appeared to suffer from neglect by the mother and that the mother is "unwilling to protect
the child" from the father and "is unwilling to develop a reasonable safety plan given the position
of the child at this time"; the findings were otherwise similar.  Family Court ordered that
"pending the hearing on this motion, care and custody of the subject child, [E.S], is temporarily
placed in the Department of Social Services" and that the parents "refrain from any and all
contact with the child [E.S.] until further order of [Family] Court."  Despite the fact that Family
Court had placed temporary custody with the DSS, DSS did not take physical custody of E.S. but
rather allowed her to remain at Four Winds.

In their answers, dated April 12, 2002, both parents sought dismissal of the petitions.
They denied any abuse or neglect of E.S. and incorporated by reference the affidavit of the
mother, sworn on April 10, 2002, and the affidavit of a psychiatrist, Dr. Howard Feinstein, sworn
on the same day.  The mother's affidavit set forth in substantial detail E.S.' mental health and
treatment history and asserted that the DSS petition "omits significant facts and distorts several
events[.]"  She stated that she and the father have "implored DSS to conduct a full investigation,
but the caseworkers have not looked at the pertinent materials I have briefly discussed."  The
mother also asserted that the plaintiffs have been "baffled" that DSS, while informing the court of

E.S.'s allegation of sexual abuse, has failed to mention that E.S.'s numerous allegations that she

suffered from multiple personality disorder "have been discredited by two psychiatrists."  The

mother further stated that she faxed the caseworker a release to talk to Dr. Feinstein, whose

affidavit stated that he had met with E.S. once in May 2001, had reviewed some of her writings,

and had supervised E.S.'s therapy with her counselor, Heidi Lipson-Copeland, in June and July,

2001.  In his affidavit, he stated his opinion that E.S. is "often an unreliable reporter," that she

may have come to believe some of her claims based on suggestions from others, that "it is more

accurate to think of the current storm she has stirred up as an imaginative creation prompted by

the suggestions of strangers rather than a case of Multiple Personality Disorder," and that he

wrote to Jacobson expressing his "worry about the risks of taking [E.S.'s] claims as truthful

without very careful evaluation."  He does not mention the sexual abuse allegations.  He also

noted that DSS had not contacted him.

    On the return date of the Order to Show Cause, April 12, 2002, DSS appeared by counsel,

a law guardian appeared on behalf of E.S. and both parents appeared with counsel.  No testimony

was heard.  The transcript shows that E.S.'s law guardian informed the court that E.S. told her

that the sexual abuse did happen and that she did not wish to be placed with either parent.

Plaintiff Douglas Sutton, through his counsel, told the Court that he had "no intention of having

any contact with his daughter and that "since the allegation was made he has agreed that his

daughter needs to be getting the proper treatment and he agrees that it is not in her best interest

while this allegation is being made that she should have any contact with him."

    Judge Sherman stated on the record that E.S. should be placed in the continuing custody

of DSS.  He stated that "if the child is going to be psychologically damaged further by a return to

the home at this stage, no matter what anyone has done, if her fears are so great that a return to the home is going to damage her, then it does not sound like it is a very good idea to do that at this moment."  Judge Sherman made no finding regarding the truth or falsity of the sexual abuse allegations, but rather stated that placement in DSS custody was in E.S.'s best interest due to her "own attitude."

The ensuing orders, dated May 16, 2002, specified that the determinations were based on the petitions.  In the orders, entitled "Order (Directing Temporary Removal of Child after Petition Filed)," Family Court found that E.S. appeared to suffer from abuse or neglect by her parents and that continued removal was necessary "to avoid imminent danger to the child's life or health" because she "has alleged that her father sexually abused her." (Emphasis added).  In the case of the mother, Family Court further found that "the child indicates that she does not feel safe with the [mother] as the [mother] does not believe her[.]" The Court concluded  that return to her home would be contrary to the child's best interests because she "has alleged that her father sexually abused her[.]" (Emphasis added.)  Family Court granted continued temporary removal and placement with DSS.

On April 12, 2002, DSS removed E.S. from Four Winds and placed her in a foster residence, the home of Debra Rivera and Barb Blom.  DSS intended the placement to be temporary, until the family with whom DSS planned to place E.S. returned from vacation; however, E.S. requested to remain in the Rivera-Blom household and was permitted to stay there throughout her placement with DSS.

Thereafter, Family Court closely monitored the case.[1]  On November 12, 2002, Family

---

[1]

According to defendants, plaintiffs and their attorneys appeared in court on at least ten occasions

Court designated Robert J. Alpern, M.D., to perform a psychological evaluation of the family. The Court stated its intention "that the evaluation address two general areas: (1) insofar as possible, whether the mental and emotional condition of the parties tends to establish or contradict the allegations of abuse and neglect set forth in the petitions; and (2) in light of the conclusions reached as to the mental and emotional condition of the parties, but not limited to whether or not the allegations of abuse and neglect are established, what is an appropriate treatment plan to address the problems of the family."  The order also specified a number of issues to be addressed by the evaluation.  Thereafter, Family Court scheduled a nine-day fact-finding hearing to commence on February 20, 2003.

In an extensive report dated January 20, 2003, Dr. Alpern concluded that E.S. had not been abused by her father and had not been endangered by her parents.  He recommended that she be placed in a residential psychiatric treatment center or therapeutic boarding school.

On January 31, 2003, the parents moved for the return of E.S. to their custody under section 1028 of the New York Family Court Act.  Family Court scheduled a hearing on the motion for February 5, 2003; however, on that date, prior to the hearing, DSS withdrew the petitions.  DSS stated that it did so based on the recommendation of its attorney, because E.S. refused to testify, although she had previously agreed to do so.

Family Court accepted the withdrawal of the petitions and dismissed them with prejudice under section 1051(c) of the New York Family Court Act.[2]  During the proceedings, plaintiffs'

_____

between April 2002 and early January 2003.

[2] Section 1051(c) provides:

> If facts sufficient to sustain the petition under this article are not established, or if, in a
> case of alleged neglect, the court concludes that its aid is not required on the record

counsel requested the court to make an express finding that "facts sufficient to sustain the petition under this article [were] not established," thus explicitly basing the dismissal on the ground in section 1051(c).  Judge Sherman stated "that's not the Court's intention" and then stated:

> I will make the requisite finding under 1051(c).  In this case the Court's aid is not required further in this matter based upon Dr. Alpern's report and based upon the discussions I've had with counsel for the parents about what they plan to do at this stage, which is to follow the recommendations of Dr. Alpern, and ... as soon as they can do this, [to] get [E.S.] into a therapeutic boarding school.
> ***
> Accordingly, I am then dismissing, based on those grounds, the petition before the Court relative to the neglect under 1051(c) on the grounds that the Court's further aid is not required.

In a written order dated February 25, 2003, Family Court vacated the prior custody and protection orders, dismissed the petitions, and awarded full legal custody of E.S. to her parents effective February 5, 2003.  Thereafter, the parents arranged for E.S. to be taken to a wilderness facility in Utah.  Eventually she recanted her accusations.

In the amended complaint in the present action, plaintiffs assert one federal claim, a section 1983 claim that the removal of E.S. and her placement with DSS infringed plaintiffs' rights to substantive due process.  Plaintiffs also set forth a number of state law claims.  Plaintiffs assert claims only on their own behalf; there are no claims by or on behalf of E.S.

By Memorandum-Decision and Order dated September 28, 2004 (Dkt. No. 27), this Court denied defendants' motions to dismiss on grounds of lack of subject matter jurisdiction and immunity.

**Section 1983 cause of action**

---

> before it, the court shall dismiss the petition and shall state on the record the grounds for the dismissal.

Plaintiffs' section 1983 cause of action – the first cause of action in the amended

complaint – is set forth below in its entirety, except for the *ad damnum* clause:

> The Defendants, under color of state law, deprived Plaintiffs of their rights, privileges, or immunities secured by the Constitution of the United States.

> The Defendants' policy of failing to supervise and train its employees in the proper technique for investigating sexual abuse allegations proximately caused the deprivation of Plaintiffs' constitutional rights.

> The Defendants' policy of hiring employees who lacked the proper and adequate background, training, and experience for objectively investigating sexual abuse allegations proximately caused the deprivation of Plaintiffs' constitutional rights.

> The Defendants' failure to train its employees demonstrated deliberate indifference to the obvious need that proper supervision and training be given concerning the proper methodology to be employed when investigating allegations of sexual abuse.

> The Defendants violated the fundamental and clearly established constitutional rights of the Plaintiffs to be free from governmental interference with family relationships.

> The Defendants violated the fundamental and clearly established constitutional rights of the Plaintiffs to parent their own child.

> The Defendants violated the fundamental and clearly established constitutional rights of the Plaintiffs to nurture their own child.

> The Defendants violated the fundamental and clearly established rights of the Plaintiffs to be free from governmental conduct, which undermines the family relationship.

> The Defendants violated the fundamental and clearly established constitutional rights of the Plaintiffs of freedom of association and right to live together as a family with their child.

> The Defendants violated the fundamental and clearly established rights of the Plaintiffs to be free from governmental conduct which undermines and interferes with a parents' rights to rear their child.

> The Defendants violated the fundamental and clearly established rights of

the Plaintiffs to familial integrity, i.e., the right to be free from governmental conduct which forcibly separates a family.

The Defendants' conduct demonstrated deliberate indifference to the fundamental and clearly established constitutional rights of the Plaintiffs.

The Defendants violated Plaintiffs' fundamental and clearly established rights without affording Plaintiffs due process of law.

The Defendants procured custody of E.S. based upon knowingly false information, based upon information they knew was distorted, based upon information they knew was a misrepresentation, and based upon the omission of information which would have supported Plaintiffs' assertions of innocence.

The Defendants lacked definite and articulable evidence giving rise to a reasonable suspicion that E.S. had been abused or was in imminent danger from either Plaintiff.

The Defendants' conduct was unreasonable and they should have known that their misconduct violated the clearly established constitutional rights of Plaintiffs as enumerated above.

By placing and refusing to remove the "indicated" report from the Central Register concerning Plaintiff Anne Serling-Sutton, the Defendants' conduct has imposed a stigma on Plaintiff Anne Serling-Sutton's reputation and such conduct has violated her liberty interest and foreclosed her freedom to pursue her career as a nursery school teacher.

The Defendants' misconduct was the direct cause of the injuries to Plaintiffs.

The injuries suffered by Plaintiffs were the obvious consequences of the Defendants' violations of Plaintiffs' constitutional rights.

The Defendants had notice of the inadequacy of their training concerning sexual abuse investigations because the constitutional violation sustained by Plaintiffs was the highly predictable consequence of the failure to adequately train.

As a result of the aforesaid conduct of the Defendants, their employees and agents, individually and in concert, the Plaintiffs sustained loss of custody of their daughter E.S.; interference with and loss of parental rights to raise and parent their daughter E.S.; interference with and loss of parental rights

-10-

> to obtain appropriate medical treatment for their daughter E.S.; interference with and loss of parental rights to visit with their daughter E.S.; exacerbation of E.S.'s psychological disorder; pain and suffering; mental anguish; humiliation; medical expenses; loss of income; loss of livelihood; attorneys' fees; loss of savings and other damages which have not yet been determined and continue to accrue.

(Paragraph numbering omitted.)

## DISCUSSION

**Standard on summary judgment**

Summary judgment is appropriate "where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law." *Beth Israel Med. Ctr. v. Horizon Blue Cross and Blue Shield of New Jersey, Inc*., 448 F.3d 573, 579 (2d Cir. 2006) (internal quotation marks omitted).  A dispute about a genuine issue of material fact exists if the evidence is such that "a reasonable [factfinder] could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).  In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the moving party.  *See United States v. Diebold, Inc*., 369 U.S. 654, 655 (1962).

**Elements of plaintiffs' section 1983 claim**

Plaintiffs' single federal cause of action is based on 42 U.S.C. § 1983.  Recovery under section 1983 "is premised upon a showing, first, that the defendant has denied the plaintiff a constitutional or federal statutory right and, second, that such denial was effected under color of state law." *Patterson v. Coughlin*, 761 F.2d 886, 890 (2d Cir. 1985).  It is undisputed that defendants in the case at bar were acting under color of state law.

Plaintiffs allege that defendants deprived them of the right to substantive due process,

guaranteed by the Fourteenth Amendment to the United States Constitution.  Specifically, plaintiffs allege interference with their constitutionally protected interest in the custody of their child.  *See generally Wilkinson v. Russell*, 182 F.3d 89, 103 (2d Cir. 1999).

In moving to dismiss the section 1983 claim, defendants argue (1) that there has been no deprivation of substantive due process; (2) that they enjoy qualified immunity; and (3) that they enjoy absolute immunity.  In addressing defendants' motion, the Court rejects plaintiffs' contention that the Court should disregard affidavits submitted by Jacobson and Gwen Wilkinson, an attorney for DSS.

**Substantive due process**

The substantive due-process guarantee "provides heightened protection against government interference with certain fundamental rights and liberty interests." *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997).  "The touchstone of due process is protection of the individual against arbitrary action of government." *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974).  Substantive due-process rights guard against the government's "exercise of power without any reasonable justification in the service of a legitimate governmental objective[.]" *County of Sacramento v. Lewis* ("*Lewis*"), 523 U.S. 833, 846 (1998).

The Fourteenth Amendment "does not provide a comprehensive scheme for determining the propriety of official conduct or render all official misconduct actionable." *Pena v. DePrisco*, 432 F.3d 98, 112 (2d Cir. 2005).  For example, "'negligently inflicted harm is categorically beneath the threshold of constitutional due process.'" *Id.* (quoting *Lewis*, 523 U.S. at 849).  Rather, "[i]n order to establish a violation of a right to substantive due process, a plaintiff must demonstrate not only government action but also that the government action was 'so egregious,

-12-

so outrageous, that it may fairly be said to shock the contemporary conscience.'" *Id.* (quoting *Lewis*, 523 U.S. at 847 n. 8).  Whether government action is such as to shock the conscience depends on the context of the conduct.  *See Lewis*, 523 U.S. at 850 (quoting *Betts v. Brady*, 316 U.S. 455, 462 (1942) ("That which may, in one setting, constitute a denial of fundamental fairness, shocking to the universal sense of justice, may, in other circumstances, and in the light of other considerations, fall short of such denial.")).

Turning to plaintiffs' substantive due process claim in the case at bar, the Court notes that it is beyond dispute that "parents have a fundamental, constitutionally protected liberty interest in the custody of their children."  *Gottlieb v. County of Orange*, 84 F.3d 511, 518 (2d Cir. 1996).  A family has, "in general terms, a substantive right under the Due Process Clause 'to remain together without the coercive interference of the awesome power of the state.'"  *Tenenbaum v. Williams*, 193 F.3d 581, 600 (2d Cir. 1999) (quoting *Duchesne v. Sugarman*, 566 F.2d 817, 825 (2d Cir. 1977)).  To prevail on a claim that this right has been violated, plaintiffs must demonstrate that the government action was "so shocking, arbitrary, and egregious that the Due Process Clause would not countenance it even were it accompanied by full procedural protection."  *Tenenbaum*, 193 F.3d at 600.

In applying the "conscience-shocking" standard in the context of child abuse investigations and findings of abuse by state actors, courts have observed that parents' interest in family integrity is counterbalanced by a "compelling governmental interest in the protection of minor children, particularly in circumstances where the protection is considered necessary as against the parents themselves."  *Wilkinson v. Russell*, 182 F.3d 89, 104 (2d Cir. 1999).  In *Wilkinson*, the Second Circuit stated: "This Circuit has adopted a standard governing case

-13-

workers which reflects the recognized need for unusual deference in the abuse investigation context. An investigation passes constitutional muster provided simply that case workers have a 'reasonable basis' for their findings of abuse." *Id.* at 104 (quoting *Van Emrik v. Chemung County Dept. of Social Servs.*, 911 F.2d 863, 866 (2d Cir. 1990)).  The *Wilkinson* court added that "the reasonable basis test places certain constitutional limitations on case workers, *i.e.*, their decisions to declare claims of abuse substantiated must be consistent with some significant portion of the evidence before them."  *Id.* at 108.  As is discussed below, the Court finds on the undisputed evidence that the investigation and decision to petition Family Court for custody of E.S. meet this reasonableness standard as a matter of law.

Plaintiffs argue that in the case at bar, defendants' conduct evinced deliberate indifference to plaintiffs' substantive due process rights, and that in the circumstances such deliberate indifference shocks the conscience, thus establishing a substantive due process violation.  The deliberate indifference standard is typically applied where the government has custody of the victim or has created or increased the danger to the victim.  *See discussion in Ying Jing Gan v. City of New York*, 996 F.2d 522, 533 (2d Cir. 1993); *see also Mosher-Simons v. County of Allegheny*, 159 F.3d 1347, 1998 WL 537526, *1 (2d Cir. 1998) (assuming, without deciding, that deliberate indifference standard applies to state actors in connection with court-ordered transfer of child already in DSS custody).  Plaintiffs cite no authority for applying the deliberate-indifference standard in the context of a child abuse investigation such as the one at bar.  In any event, for the reasons discussed below, defendants' conduct does not evince deliberate indifference.

Defendants contend that they conducted a thorough investigation and that, as a result,

-14-

they reached a good faith belief that the abuse had occurred.  In evaluating the reasonableness of defendants' conclusion that E.S. had been sexually abused by her father, it is highly significant that E.S., a sixteen-year-old girl of normal intelligence, consistently maintained in her contacts with Lipson-Copeland, Jacobson, and the staff at Four Winds that the abuse had occurred.  There is no evidence that E.S. ever indicated that the allegations were not true to anyone at any time before her placement in Utah after Family Court dismissed the petition.[3]

Plaintiffs point to Jacobson's testimony that on two occasions she "sat down and spoke[] to [E.S.] in detail about the underlying allegation of sexual abuse."  Plaintiffs apparently feel that Jacobson should have done this more than twice.  It is clear, however, that Jacobson had numerous other interactions with E.S.  Jacobson stated that E.S. did not want to talk about the abuse but consistently maintained that it had occurred.  Jacobson also stated that she observed that E.S. suffered from depression and that E.S. had cuts on her body consistent with self-inflicted wounds, symptoms which Jacobson viewed as consistent with abuse.

Jacobson interviewed E.S.'s parents, her younger brother, her best friend, her godmother, the aunt with whom E.S. was staying temporarily, and the social worker at E.S.'s school.  She visited the aunt's home while E.S. was staying there.  Plaintiffs state that Jacobson only interviewed Douglas Sutton and E.S.'s younger brother once, although plaintiffs do not suggest why this was insufficient or what would have been disclosed by additional interviews.  Plaintiffs also state that defendants should have interviewed Douglas Sutton's adult daughters from a prior marriage, although they were not in the home during the years when the alleged abuse of E.S.

---

[3]

Betsy Stevens, the law guardian appointed by Family Court, testified at the April 12, 2002 hearing that E.S. told her the abuse had occurred.  Dr. Alpern, the psychiatrist appointed by Family Court, relates in his report that E.S. refused to discuss the allegations with him.

occurred.  Plaintiffs contend that Jacobson should have made a home visit, although on the facts

of this case there is no reason to believe it would have revealed any significant evidence.

Plaintiffs also complain that Jacobson ignored the fact that E.S. had a motive to make false

accusations against her parents, because they took away her internet privileges.  Jacobson

rejected this as a motive, stating that, in the context of the situation, it "makes no sense."

Plaintiffs fault the investigation because defendants did not interview E.S.'s pediatricians

or obtain her medical records. Plaintiffs point out that these records reflect no physical evidence

of sexual abuse, nor do they reflect other symptoms of abuse such as chronic nightmares during

the years when the abuse was allegedly occurring.  Mary Anne Kiernan, M.D., E.S.'s

pediatrician until she was six, testified that she saw no physical or emotional signs of abuse.

Likewise, Audrey DeSilva, M.D., and Marguerite Uphoff, M.D., E.S.'s pediatricians from when

she was nine until January 2002, wrote in a report dated July 9, 2002, that there was nothing in

E.S.'s records that appeared suspicious for sexual abuse and that "prior to the last year or so,

there have been no behavioral difficulties, acting out or evidence of depression or mood

disorder."  Jacobson agreed that she should have obtained the medical records, but stated her

view that medical evidence is rarely found in child sexual abuse cases, so the lack of evidence

would not be determinative.  Her supervisor, Van Schoik, stated that in her experience, "medical

records rarely, if ever, show any evidence of sexual abuse even in cases where [the perpetrator]

has confessed."  Indeed, even Drs. DeSilva and Uphoff noted that sexual abuse often leaves no

physical signs.  And Jacobson testified that E.S. did not want to talk about the abuse she

allegedly endured and that her verbal statements were not specific; thus, it is unlikely that

medical records would serve to prove that it did not occur.  Plaintiffs, however, point to a story

-16-

apparently written by E.S. about a girl named "Angel," describing abuse of an extreme nature that would likely have left physical signs.  According to Jacobson, in a session with Lipson-Copeland, E.S. indicated that she was Angel.  Jacobson testified that when she asked E.S. about the Angel story, E.S. "scribbled out" references to the extreme incidents, stating, "You don't need to know that stuff."  Jacobson did not necessarily view the story as the "absolute truth" and said that maybe it was "a way for [E.S.] to express something that did happen to her."  Jacobson could reasonably have believed that certain incidents in the Angel story had not occurred but that E.S. nevertheless had been sexually abused.

Jacobson's investigation also included interviews and consultations with Heidi Lipson-Copeland, E.S.'s therapist, who had been treating her for over two years.  It was to Lipson-Copeland that E.S. first stated that she had been abused.  Lipson-Copeland testified that upon hearing the allegation, she "didn't know what to make of what was happening."  She also testified that she reported the allegation to DSS because she had "a suspicion that it was true," although she also had "a suspicion that it wasn't true."  Lipson-Copeland told Jacobson that E.S. consistently maintained that the allegation was true.

Jacobson also interviewed staff, including E.S.'s therapist Kelly Keohan, at Four Winds, where E.S. was placed from March 25, 2002 until DSS placed her in foster care on April 12, 2002.  While at Four Winds, E.S. maintained that the sexual abuse had occurred.  The Four Winds records show that E.S. was referred by her parents for "increasing self-abusive behavior, depressive symptomatology and assessment of her mental status[.]"  According to the records, E.S. reported that she had recently disclosed that she had been sexually abused by her father and that she had been unable to manage the memories and stress relative to the disclosures.  The

records reflect no attempt to determine whether the sexual abuse actually occurred; rather the treatment appears to have focused on the need for E.S. to learn "coping strategies."  The records note that there is no evidence of disassociative identity disorder (multiple personalities).  At her discharge, the records note that "there was no evidence of a thought disorder."

Plaintiffs complain that defendants did not interview Dr. Howard Feinstein, the psychiatrist whose affidavit plaintiff Anne Serling-Sutton submitted to Family Court on April 10, 2002, in support of her answer to the removal petition.  Dr. Feinstein was not a treating provider and had met with E.S. only once, in May 2001 – nine months before E.S. made the sexual abuse allegations.  This meeting occurred at plaintiffs' request after E.S. told Lipson-Copeland that she had multiple personalities; Lipson-Copeland felt she did not have the expertise to deal with that condition.  Thereafter, Feinstein met with Lipson-Copeland twice, in June and July 2001, to supervise E.S.'s therapy with Lipson-Copeland, and at some point he reviewed E.S.'s writings.  As noted, in his April 10, 2002 affidavit to Family Court, he stated his opinion that E.S. is "often an unreliable reporter," that her purported multiple personality disorder is "an imaginative creation prompted by the suggestions of strangers," and that her claims should not be "taken as truthful without very careful evaluation."  He does not even mention the sexual abuse allegations.[4]  Under all the circumstances, defendants' failure to interview Dr. Feinstein is

---

[4]

In a second affidavit, dated June 27, 2002, submitted to Family Court after the removal order, Dr. Feinstein states that in his medical opinion "it is a reasonable hypothesis that [E.S.'s] 'memories' of sexual abuse by her father are in fact false memories. *i.e.*, her memories may have been induced by the therapeutic setting in which she had apparently immersed herself on the internet as well as in Ithaca."  He adds: "Certainly this hypothesis needs to be explored[.]"  It appears from the affidavit that the therapeutic setting in Ithaca to which he refers is E.S.'s two-year course of therapy with Lipson-Copeland.  He states: "Certainly, [E.S.'s] two-year therapeutic history with Heidi Lipson-Copeland is crucial to determining whether [E.S.'s] memories are iatrogenic in origin.... [B]eyond merely reviewing Ms. Heidi Lipson-Copeland's

not unreasonable.

Plaintiffs urge, however, that if Jacobson had conducted a proper investigation (for example, by obtaining E.S.'s medical records and interviewing Dr. Feinstein), she would have obtained evidence that E.S.'s allegations of sexual abuse were false.  However, as noted, even Drs. DeSilva and Uphoff acknowledged that the lack of physical evidence of abuse is inconclusive.  While the lack of physical evidence might have suggested that the most extreme incidents in the Angel story had not actually occurred, defendants could reasonably believe that certain incidents in the story had not occurred but that E.S. nevertheless had been sexually abused.  Indeed, as discussed above, Jacobson did not necessarily view the story as an accurate account of events.  And, with respect to Dr. Feinstein, there is no showing that, if defendants had interviewed him, he would have said anything different from what was in his affidavit or that an interview would have uncovered any evidence that the allegations were false.[5]  Plaintiffs point to no evidence that Jacobson overlooked that would have made it unreasonable to conclude that the abuse had occurred.

Overall, the undisputed record evidence, viewed in the light most favorable to plaintiffs, reflects an extensive investigation which disclosed substantial proof that E.S. had been sexually abused by her father.  Although plaintiffs argue that defendants should have explored other

---

records relevant to [E.S.], an expert should be provided with information pertaining to what therapeutic techniques and interview methodology Ms. Lipson-Copeland engaged in when treating [E.S.]."   He does not state that in his opinion the memories were false; rather, he recommends that an expert be appointed to review the entire matter to determine whether the memories were false.

[5]

As noted, in his second affidavit, dated June 27, 2002, he merely said their falsity was "a reasonable hypothesis" that "needs to be explored."  He recommended that Family Court appoint an expert to review the matter, which it did.

avenues of investigation, the record falls far short of demonstrating that the investigation reflects

unreasonableness or deliberate indifference in the constitutional sense.  Further, the undisputed

evidence, viewed in the light most favorable to plaintiffs, supports defendants' position that as a

result of the investigation they reached a good faith belief, based on a significant portion of the

evidence, that the abuse had occurred.  As such, the decision to petition Family Court for an

order of removal does not reflect unreasonableness or deliberate indifference in the constitutional

sense.

   Finally, plaintiffs' contention that defendants infringed their substantive-due-process

rights by submitting to Family Court a petition and supporting affidavit containing willful

falsehoods, misrepresentations, and material omissions is wholly lacking in merit.  Plaintiffs

point to two errors: first, the statement in Van Schoick's affidavit in support of the petition

against the father that E.S. had disclosed the abuse to her mother, and second, the statement in

Van Schoick's affidavit in support of the petition against the mother that E.S. had been

exhibiting self-mutilating behaviors since she disclosed the abuse.  Rather, E.S. had disclosed the

abuse to her therapist of two years as well to Jacobson and others, and E.S. insisted that she

did not feel safe with her mother because her mother did not believe her allegations.  With

respect to self-mutilation, although it may not be entirely clear when this behavior occurred,

Jacobson specifically stated that she saw cuts on E.S.'s body, and there are references in the

record to other self-destructive behavior such as burning herself, not eating, and purging, some

of which occurred at Four Winds.  There is no basis in the record, the transcript of the Family

Court proceedings, or in Judge Sherman's order to believe that these inaccuracies were

intentional, that they were made in bad faith, that they were significant, or that they had any

-20-

bearing on his ruling.  Plaintiffs also contend that some statements in the Van Schoik affidavits "falsely implied" certain facts.  To the limited extent that these implications can actually reasonably be drawn from the affidavits, there is no basis to believe that they were intentional, that they were made in bad faith, that they were significant, or that they had any bearing on the court's ruling.  The undisputed evidence shows that in drafting and presenting the petition and supporting affidavits, defendants did not act unreasonably or with deliberate indifference in a constitutional sense.

The undisputed facts, viewed in the light most favorable to plaintiffs, show that plaintiffs' substantive-due-process right to family integrity was not infringed.  Accordingly, defendants have established that, based on the undisputed facts, they are entitled to judgment as a matter of law dismissing the section 1983 cause of action on the ground that there was no deprivation of substantive due process.

**Qualified immunity**

Defendants also urge that, even if plaintiffs have made out a claim that defendants' conduct violated their right to substantive due process, they are entitled to qualified immunity. Under federal law, "[t]he defense of qualified immunity shields governmental officials from civil liability if the official's conduct did not violate constitutional rights that were clearly established at the pertinent time or if it was objectively reasonable for the official to believe that the conduct did not violate such rights."  *See Cecere v. City of New York*, 967 F.2d 826, 829 (2d Cir. 1992); *accord Wilkinson*, 182 F.3d at 97.  It has long been clearly established that a parent's right to family integrity is counterbalanced by the compelling governmental interest in the protection of children, and that, in an abuse investigation context, case workers must have a reasonable basis

for their findings of abuse.  *See Wilkinson*, 182 F.3d at 104.  Thus, defendants are entitled to qualified immunity provided that it was objectively reasonable for them to believe that they had a reasonable basis for their conduct.  *Id.* at 107, n.10; 109.  Indeed, the Second Circuit has emphasized "the importance of the availability of qualified immunity where child welfare workers are seeking to protect children from abuse[,]" stating that "[i]f caseworkers of reasonable competence could disagree on the legality of [a] defendants actions, their behavior is protected."  *Tenenbaum*, 193 F.3d at 605 (citations and internal quotation marks omitted); *accord Van Emrik*, 911 F.2d at 866.  When qualified immunity is asserted in a motion for summary judgment, of course, the facts material to the claim of qualified immunity must not be genuinely disputed.  *See Cecere*, 967 F.2d at 829.

On the undisputed facts here, as discussed above, in particular the insistence by E.S., then sixteen years old, that the abuse had occurred, the Court finds as a matter of law that it was objectively reasonable for defendants to believe that they were acting within constitutional bounds.  Thus, they have demonstrated as a matter of law that they are entitled to summary judgment on the ground of qualified immunity.

**Absolute immunity under federal law**

The Second Circuit has observed that the granting of absolute immunity depends "on the function being performed" and that it "is extended only so far as is necessary to the effective functioning of the judicial process."  *Robison v. Via*, 821 F.2d 913, 918 (2d Cir. 1987).  As this Court previously noted, the *Robison* court rejected the argument that the official investigation of alleged child abuse is a function so sensitive as to require a total shield from judicial review or that it cannot be performed properly unless all scrutiny is denied.  *See id.* at 919.  This Court

-22-

added that, inasmuch as defendants had not been delegated judicial or quasi-judicial duties by Family Court, they were not entitled to absolute immunity on the ground that they were performing a judicial or quasi-judicial function in this respect. *Compare Mosher-Simons v. County of Allegany*, 99 N.Y.2d 214, 220 (2002) (granting absolute judicial immunity to DSS caseworker performing home study ordered by Family Court to aid it in reaching placement decision).

In its prior decision, however, this Court did not address the distinct issue of whether defendants were protected by the absolute immunity accorded to government officials performing prosecutorial functions. *See Mangiafico v. Blumenthal*, 471 F.3d 391, 395-96 (2d Cir. 2006); *Walden v. Wishengrad*, 745 F.2d 149 (2d Cir. 1984). Defendants now urge that they enjoy absolute immunity in connection with their decision to petition Family Court for custody of E.S., contending that the decision is functionally similar to a prosecutor's decision to institute a criminal proceeding. The Second Circuit has not yet decided the question of whether prosecutorial immunity protects social services workers in such situations. In view of this Court's determination that there has been no constitutional deprivation and that, in any event, defendants are entitled to qualified immunity, it is unnecessary for the Court to decide this issue of first impression in this Circuit.

**State law claims**

Defendants urge this Court to rule on the state law claims, in particular the issue of immunity. The Court notes that, on their prior motion (Dkt. No. 20), defendants sought dismissal of plaintiffs' state law claims on the ground of absolute judicial immunity under *Mosher-Simons v. County of Allegany*, 99 N.Y.2d 214 (2002). In *Mosher-Simons*, New York's

Court of Appeals granted absolute immunity to a DSS caseworker performing a home study ordered by Family Court to aid it in reaching a placement decision.  New York's high court reasoned that the placement decision was a judicial function, that the home study needed for the court to reach the placement decision was "an integral part of the judicial decision-making process," and that thus it should be cloaked with judicial immunity.  *See id.* at 220.  Because DSS did not conduct the investigation in issue in the instant case pursuant to a court order, this Court denied dismissal on this ground (Dkt. No. 27).

Subsequent to this Court's denial of defendants' dismissal motion in 2004, New York State courts have addressed other aspects of immunity as it pertains to the investigation of child abuse and neglect allegations.  *See, e.g., Carossia v. City of New York*, 835 N.Y.S.2d 102 (1st Dep't 2007); *Sean M. v. City of New York*, 795 N.Y.S. 2d 539 (2d Dep't 2005).  On the present record and the present state of the case law, the Court does not view its prior ruling as conclusive on the question of absolute immunity under New York State law.  Nor does this Court deem it appropriate to interject itself into this still-evolving area of state law.

Having dismissed the single federal claim, the Court declines to exercise jurisdiction over the state law claims.  They are dismissed without prejudice.

## CONCLUSION

It is therefore

ORDERED that defendants' motion for summary judgment (Dkt. No. 63) is granted; and it is further

ORDERED that the first cause of action in the amended complaint is dismissed on the merits; and it is further

ORDERED that the remainder of the amended complaint is dismissed without prejudice.

IT IS SO ORDERED.

September 25, 2007
Syracuse, New York

_____
Norman A. Mordue
Chief United States District Court Judge